# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed December 8, 1915.

GEORGE WEEMS WILLIAMS, ET AL., PLAINTIFFS,
VS.
MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

*Geo. Weems Williams* for plaintiffs.
*S. S. Field*, City Solicitor, for defendants.

HEUISLER, J.

The above entitled case is known locally as the "Canteen Case," and is the controversy between the Park Board of Baltimore City, speaking through a majority of its membership, at the time of the filing of the bill, and the "Mayor and City Council of Baltimore," as a body corporate, and the various officials constituting the "Board of Estimates of the City of Baltimore." The tract of land known as "Fort McHenry," the same being the property of the national government, and which it has used for military and other governmental purposes, was in the year 1914 by an Act of Congress duly approved, turned over to the Mayor and City Council of Baltimore, subject to the reservations, terms and conditions of the Act, for use as a public park. Under the provisions of the Act a certain portion of the property was set aside for use of the "Immigration Station," which the National Government is now building at the Port of Baltimore, and on that reserved property was a building known as the "Canteen," which was disposed of by the Government to the Mayor and City Council for a nominal consideration. It became necessary,

after notice from the Government, to remove that building to another part of the tract. The controversy begins here. The Park Board desired to move the building to a certain site on the Spring Garden site of the Fort McHenry tract to be there located and used for public recreational purposes and activities, including dancing and swimming. The Board of Estimates, insisting that the purchase of the building was made by the Mayor and City Council for no other purpose than to apply it to the use of one of the Boat Clubs, arranged to have the building removed to another site on the Spring Garden side of the tract and there located, with the intention of repairing and adapting the same for and to the use of the Baltimore Corinthian Yacht Club; the Board of Estimates also directed that the building should be removed to the site selected by it at the expense of *its contingent fund.* The title to the building was to remain in the city and it was not proposed that said building be given or sold to the said Yacht Club or to any private person or corporation. The use of the property by the Yacht Club, or any other boat club, was to be paid for, by rentals, so long as used, and the rentals were to be so arranged as eventually to repay to the City all the money expended and outlay incurred. These facts appeared in evidence from a proposed agreement marked "Defendants' Exhibit C." The plaintiffs in the case appear and claim relief in a dual capacity.

(a) Officially as members of the Park Board and (b) as citizens, taxpayers, residents and voters.

(a) As members of the Board of Park Commissioners they contend that, without their official consent, neither the Mayor and City Council nor the Board of Estimates, nor any city officials, have the right or power to "move buildings across parks or locate buildings in parks, or *interfere in any wise* with the care and control of public parks vested by law in the Board of Park Commissioners; and

(b) as citizens and taxpayers they contend that *no use* can be made of "public funds or property for the removal, re-location and repair of a public building for the use of any private club, association, corporation, individual or individuals"; and that they are entitled to require the defendants

not to expend public money for private purposes and not to devote public property to private uses."

The first contention of the plaintiffs cannot be maintained. The Board of Park Commissioners has no entity distinct from that of the municipality— it is merely an agency and subordinate department of the City Government. It has no corporate existence and therefore cannot sue or be sued as a Board; it is a mere sub-division of the City Government. In 8 Hun. (N. Y.) 247, the Court in speaking of the Department of Public Charities and Correction in New York, said:

"They constitute only a branch of the City Government and part of the municipality appointed by its officers, with *some independent powers;* but in the main subservient to and under the supervision and control of the general government. They have no corporate rights; they can neither sue or be sued."

Again in McQuillan Municipal Corporations, 5th Vol. Sec. 2497, we find the general text:

"Municipal boards have no authority to institute legal proceedings," and again, under the provisions of the City Charter (Sec. 62, fol. 91), this suit, as far as the Park Board as plaintiff is concerned, must fail.

"The City Solicitor shall have general supervision and direction of all legal business of the City.

"*He shall have charge* and *direction* of the preparation and trial *of all suits, actions* and *proceedings* of every kind to which the City or any municipal officials, department, special commission or *board,* shall be a party in any court, local, State or Federal, etc."

This suit, under the Charter provisions, could not have been instituted except under the charge and direction of the City Solicitor, and, from the evidence, this was not done, and for this, if there were no other reasons, the suit must fail.

(b) An examination of the claim of the plaintiffs as taxpayers leads to these conclusions. From the evidence this case does not show an attempt to spend public money for private use; it is the purchase of an attraction for the benefit of the Park. There is no evidence of the making of an investment of public money in anything or

the diverting of public funds for any private purpose. The City owns the property and proposes to lease it and it is going to put it into proper use for such rental and at the end of the tenancy the improved property will continue as the property of the City. Under the testimony the removal of the building by the Board of Estimates was at the expense of the contingent fund, *a fund in hand,* and a fund that the Board had a right to use for the removal of the building. The building had to go somewhere, it was in the way of the National Government; unless the Park Board was allowed to *locate* it—it refused to move it, and therefore the Board of Estimates faced an emergency—a public and not a private one—and the contingent fund was immediately legally available. No debt was created by this attempted action of the Board of Estimates and the "credit of the Mayor and City Council" was not given or loaned to or in aid of any individual, association or corporation, in violation of Sec. 7, Art. 2 of the State Constitution, because the contingent fund was at hand. It follows that as taxpayers plaintiffs cannot maintain this action. They are not of a special class that is specially damaged. They have shown no damage differing in kind from that that would be sustained by any other taxpayers in the community. They complain of the expenditure of public money for private use—and the public use of private property and no such condition is disclosed in the records. Their grievance is an alleged illegal exercise of official functions by the Board of Estimates, but "those who question them, if they would have a preventive remedy, must invoke the action of the officer whom the law has appointed to sue in such cases. No private person or number of persons can assume to be the champions of the community and in its behalf challenge the public officers to meet them in the Courts of Justice to defend their official acts."

Doolittle vs. Supervisors, 18 N. Y. 155.

Following these findings, the Court will sign an order dissolving the injunction heretofore granted, and dismissing the Bill of Complaint, the costs of the proceeding to be paid by the defendant, the Mayor and City Council of Baltimore.